UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,                         :
                                                  :
            - against -                           :
                                                  :        23-CR-370 (JGLC)
JOSEPH LEWIS, et al.,                             :
                                                  :
                      Defendants.                 :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM ON BEHALF OF JOSEPH C. LEWIS

David M. Zornow
Christopher J. Gunther
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Defendant Joseph Lewis*

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ...................................................................................................2

    A.    Brief Personal History...............................................................................2

    B.    Bases to Depart from the Guidelines for Age and Health.......................4

        1.    Advanced Age ...............................................................................4

        2.    Medical Conditions ......................................................................6

    C.    Foreign National Status...........................................................................11

    D.    Philanthropic Efforts and Significant Positive Impact...........................15

SENTENCING CONSIDERATIONS .......................................................................18

    E.    The Offense and the Sentencing Guidelines Range...............................18

    F.    Section 3553(a) Factors...........................................................................19

    G.    Application of the Section 3553(a) Factors.............................................20

        1.    The Nature and Circumstances of the Offense ...........................20

        2.    Mr. Lewis's Personal History and Characteristics .....................21

        3.    Promoting Respect for the Law, Just Punishment, and Adequate Deterrence .................................................................................22

CONCLUSION....................................................................................................25

## PRELIMINARY STATEMENT

We respectfully submit this memorandum regarding the sentencing of Joseph Lewis on

April 4, 2024.  We appreciate that the Court has expedited the sentencing date in view of Mr.

Lewis's circumstances.  As set forth in more detail below:

- At age 87, Mr. Lewis is nearing the end of life in declining health, ███████████ ███████████████████████████  His plea agreement provides that (1) the Government will not oppose a downward departure, based on his age and health, from the stipulated Guidelines range of 18-24 months; and (2) the standard waiver of appellate rights will not apply to a sentence of imprisonment. ██████████████

- Mr. Lewis's status as a non-U.S. citizen (he is a U.K. citizen) amplifies these risks further because the Bureau of Prisons ("BOP") cannot designate him to a prison camp with a dormitory setting.  Rather, the BOP designates a non-citizen to a higher security facility that is far more crowded with a more dangerous inmate population.

- Once the BOP takes custody of a non-citizen, the BOP must at the completion of his term of imprisonment transfer the prisoner to Immigration and Customs Enforcement ("ICE").  The former inmate is then confined at an ICE detention facility for a formal deportation that can take months.  The Inspector General of the Department of Justice has issued reports detailing inadequate medical care at ICE facilities, an additional layer of risk given Mr. Lewis's medical needs.

- Within hours of learning of his Indictment, Mr. Lewis traveled from abroad to New York City voluntarily to face the charges rather than fight extradition.  He pleaded guilty at his first in-person appearance before Your Honor.  He is in the process of settling a parallel civil action by the Securities and Exchange Commission, agreeing to an injunction and his payment of the maximum treble civil penalties.

- Mr. Lewis has no prior criminal history and has done a lifetime of public good through charity and the pursuit of medical advancements.  He will pay $50 million (many times the losses in this case) in fines and forfeiture by his company, Broad Bay Ltd.

We agree with the Probation Department's recommendation of a sentence of three years'

probation and a fine of $5 million.  Notably, pursuant to Broad Bay's plea agreement, Mr. Lewis

already has agreed to honor the following special conditions of Broad Bay's probation: (1) Mr.

Lewis and any company or individual acting under his control will not serve on the board of

directors or participate in board meetings of any corporation publicly traded in the U.S.; (2) Mr.

Lewis and any company he controls will cease any ownership or control of the hedge fund at issue in the offense conduct; and (3) Broad Bay will provide continued cooperation to the U.S. Attorney's Office as specified in its plea agreement.

If the Court imposes a sentence of probation, Mr. Lewis will immediately depart from the United States voluntarily through his own travel arrangements. Once he has left, Mr. Lewis will be barred under U.S. law from reentering due to his felony convictions in this case. Regrettably, he will not be able to return to the United States to visit his children, grandchildren, and great-grandchildren who reside here. However, given his failing health and intense medical needs, Mr. Lewis's departure under his own travel arrangements is far safer than a formal deportation process in ICE detention with inadequate medical care.

We respectfully submit that probation with all these conditions is sufficient, but not greater than necessary, to serve the ends of justice and to meet the sentencing factors in 18 U.S.C. § 3553(a).

## BACKGROUND

### A.    Brief Personal History

In 1937, amid the Great Depression, Mr. Lewis was born into a Jewish family living above a pub in the poor and overcrowded East End of London, England. During the Blitzkrieg in 1940-41, he was separated from his family because he was among the young children whom the British government evacuated to live with foster families in the countryside until the end of the German bombing campaign. After the War, Mr. Lewis reunited with his family. Through the chaotic reconstruction of London, he worked long hours in his father's small, struggling catering business, called Tavistock. Mr. Lewis quit school and focused all his time on helping his father manage and grow the business. At 23, Mr. Lewis married and started his own family,

2

including one son and one daughter, while expanding the family business to include a restaurant chain and a string of shops selling food and gifts to tourists from all over the world.

In his forties, Mr. Lewis began venturing out globally as an entrepreneur in a variety of fields. With minimal formal education, he achieved enormous success building and running thriving businesses for the long term – not typically buying and selling companies. Today, Tavistock consists of more than 200 companies and 8,400 employees (4,700 in the United States) across thirteen countries. Tavistock covers twelve varied investment areas, including real estate development, restaurants, hospitality, energy, agriculture, information and communication technology, and sports and entertainment.

Now 87, Mr. Lewis is a resident of the Bahamas. When he learned that he had been indicted, Mr. Lewis immediately traveled from abroad to New York City to appear in court to face the charges rather than fight extradition. For the ensuing nine months, while on bail, Mr. Lewis has lived in Florida, with his health challenges confining his movements.

Mr. Lewis has two grown children, as well as grandchildren and great-grandchildren. In letters to the Court, two grandchildren have described Mr. Lewis's impact on his family and on various communities. (Ex. A, Letter from Joanna Beucher; Ex. B, Letter from Dr. Alexandra Silverton, at 1.) As Joanna Beucher put it:

> My grandfather has spent his entire life trying to provide for those he loves. It is how he spends his every breath. He is hard-working, determined, and will forever fight for his family. He is a loving and caring man who will do whatever he can to lend a hand to a friend in need. With his wealth, he has always strived to do good, give back to the communities he touches, and leave the world better than when he found it. He is an important presence in my life, my children's lives, and, hopefully, the next generation to come.

(Ex. A.)

3

**B.      Bases to Depart from the Guidelines for Age and Health**

In Mr. Lewis's plea agreement, the Government has agreed not to oppose a departure from the stipulated Guidelines range of 18 to 24 months based on Mr. Lewis's "age under U.S.S.G. § 5H1.1, and/or [his] physical condition under U.S.S.G. § 5H1.4, and the Government will not contest or otherwise oppose the application of either departure or any related adjustment to the Stipulated Guidelines Range." (Plea Agreement at 3.) The bases for such departures in this case are compelling.

*1.      Advanced Age*

Mr. Lewis is 87 years old, and federal inmates of his vintage are rare in the extreme. As of March 16, 2024, just 3.0% of the current federal inmate population is over age 65. *See Inmate Age*, Fed. Bureau of Prisons (Mar. 16, 2024), www.bop.gov/about/statistics/statistics_inmate_ age.jsp. When the cohort is narrowed to those over 80, the numbers are vanishingly small. During the 2000s, federal inmates over age 80 numbered as low as 18 inmates nationwide and, at the most, 70 such inmates. *See* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States* 40 tbl. 8 (2012) (hereinafter "Human Rights Report"), www.hrw.org/report/2012/01/28/old-behind-bars/aging-prison-population-united-states. When there were 70 inmates over age 80, they represented less than 0.04% of the total federal inmate population, most or all of whom presumably committed their underlying offenses years earlier. *Id*. The BOP runs 122 federal correctional institutions, which means that there are far more prisons in the system than there are federal inmates older than 80. In 2009, the last year for which we could find statistics, just 15 inmates nationwide were admitted to a federal prison over the age of 80. *Id*. at 41 tbl. 9.

4

Mr. Lewis is not just older than 80.  He is older than 86.  It stands to reason that if the

class in question were reduced to federal inmates over the age of 86, the minute figures

referenced above would be reduced further still, perhaps approaching zero.

In 2016, the Office of Inspector General of the U.S. Department of Justice issued a report

entitled *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (hereinafter

"Aging Report").[1]  According to the Aging Report, "[s]everal studies, including one published

by the *American Journal of Health*, state that an inmate's physiological age averages 10-15 years

older than his or her chronological age due to the combination of stresses associated with

incarceration and the conditions that he or she may have been exposed to prior to incarceration."

*Id.* at 1-2.  The report, which notably considered inmates over age 50 to be "aging," stated:

> The OIG found that aging inmates are more costly to incarcerate than their
> younger counterparts due to increased medical needs. We further found that
> limited institution staff and inadequate staff training affect the BOP's ability to
> address the needs of aging inmates. The physical infrastructure of BOP
> institutions also limits the availability of appropriate housing for aging inmates.

*Id.* at i.

The Human Rights Report similarly addressed the challenges of incarcerating elderly

persons even when healthy:

> Prisons are primarily designed for the young and able-bodied; it takes additional
> effort on the part of corrections officials to meet the needs and respect the rights
> of the old and infirm.

*Id.* at 43.

> Older prisoners, even if they are not suffering illness, can find the ordinary rigors
> of prison particularly difficult because of a general decline in physical and often
> mental functioning which affects how they live in their environments and what
> they need to be healthy, safe, and have a sense of well-being. In addition to the

---

[1]    Off. of Inspector Gen., U.S. Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (2016) (hereinafter "Aging Report"), https://oig.justice.gov/reports/2015/e1505.pdf.

memory loss and other ordinary cognitive impairments that can come with aging, older prisoners sooner or later will develop:

> [D]ecreased sensory acuity, muscle mass loss, intolerance of adverse environmental conditions, dietary intolerance and general vulnerability [which] precipitate collateral emotional and mental health problems.

*Id.* at 45 (alterations in original) (citation omitted).

In sum, Mr. Lewis faces unique risks from incarceration even before considering his health challenges, which are varied and significant.

### 2.  *Medical Conditions*

We are submitting to the Court letters from Mr. Lewis's various treating specialists. Below is a summary of the most salient medical information.





Incarceration would interrupt Mr. Lewis's ongoing assessment and treatment by professionals well familiar with his condition.

Yet the Inspector General's Aging Report noted that at one federal correctional institution, the average wait time for an inmate to be seen by an outside specialist for cardiology, neurosurgery, pulmonology, and urology was 114 days, and the wait time grew to 256 days for those inmates waiting to see outside specialists for additional or routine appointments.  Aging Report, *supra*, at 18.

**b.  Falling Risk**

It is well established that falling is a primary risk for the elderly.  As described in the journal *American Family Physician*:

7

> [F]alls are responsible for 70 percent of accidental deaths in persons 75 years of age and older. The elderly, who represent 12 percent of the population, account for 75 percent of the deaths from falls. . . . The injury rate for falls is highest among persons 85 years of age and older (i.e., 171 deaths per 100,000 white men in this age group).
>
> Annually, 1,800 falls directly result in death.

George F. Fuller, *Falls in the Elderly*, 61 Am. Fam. Physician 2159 (Apr. 1, 2000) (citations omitted), www.aafp.org/pubs/afp/issues/2000/0401/p2159.html.

A recent study spelled out the enhanced risk faced by elderly inmates in a prison setting, even for those in good health, as follows:

> Falls are a leading cause of serious injury and death among older adults. . . . In the correctional setting, many factors can heighten the risk of falls, such as dimly lit or crowded walkways. Furthermore, institutionalized older adults who spend the majority of their time indoors are at heightened risk for vitamin D deficiency due to insufficient sun exposure. Vitamin D is critical for both muscle and bone health, and vitamin D deficiency puts older people at risk of falls. Any additional obstacles to normal ambulation — such as being required to walk with ankle or wrist restraints — are also likely to enhance the risk of falling. Moreover, those who have few opportunities to exercise may experience physical deconditioning, a strong risk factor for serious fall-related injury.

Rachael Bedard, Lia Metzger & Brie Williams, *Ageing Prisoners: An Introduction to Geriatric Health-Care Challenges in Correctional Facilities*, 98 Int'l Rev. Red Cross 917, 923-24 (2016), https://international-review.icrc.org/sites/default/files/irrc-903-12.pdf.







The BOP's facilities to deal with falling risks are limited.  As the Inspector General found, "[a]ging inmates often require lower bunks or handicapped-accessible cells, but overcrowding throughout the BOP system limits these types of accommodations."  Aging Report, *supra*, at ii.





Each of the health issues described above would present significant challenges to any inmate, regardless of age.  In combination, they make the prospect of incarceration for an individual in his late 80s an unacceptable risk for both the inmate and the BOP.  The federal prison system simply is not structured to care for an individual of Mr. Lewis's extreme age and health status.

**C.    Foreign National Status**

Mr. Lewis is a citizen of the United Kingdom and a resident of the Bahamas.  Because he is not a U.S. citizen, he would not be eligible under BOP regulations for designation to a minimum security prison camp.[2]  Instead, he would be designated to a low security prison environment that would be far more challenging and physically rigorous.

For example, camps house offenders with shorter sentences (in no circumstance above ten years) who are generally well behaved, in part because of their security risk profile and in part out of fear of being moved to a low security environment.  By contrast, the low security environment is populated by inmates with sentences greater than ten years, often because of gun or violent offense history, members of gangs and organized crime and sex offenders, and other poor security risks.  Statistically, from 2008 through 2017, there was a 143% greater chance of

---

[2]    The BOP Designation and Sentence Computation Center team responsible for determining Mr. Lewis's security level will include the application of the Public Safety Factor (PSF) of "Deportable Alien."  When that PSF is applied, it requires that the individual must be housed in at least a low security institution.  Without that factor, Mr. Lewis would be classified at minimum security and eligible to be assigned to a Federal Prison Camp.

being assaulted at a low security facility than at a minimum security camp.  Low security facilities also face larger inmate populations giving rise to more overcrowding and inmate management problems.  For instance, FCI Butner-Low houses 956 inmates, whereas Butner camp has 232 inmates.

Mr. Lewis's post-incarceration return home would be further complicated by the difficulty of an ICE detainer that would be lodged (upon his placement with the BOP) to eventually accommodate the process of deporting a foreign national at the completion of his sentence.  ICE's Criminal Alien Program is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails – with the enforcement of removal overseen by ICE's Office of Detention and Removal Operations.

When the prisoner's sentence is complete, he is placed in ICE custody and his status is changed from "prisoner" to "detainee."  Armed ICE agents transport the detainee (typically by bus) to another detention center once formally released from BOP custody to await the process of being physically removed from the United States.  Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to wait on processing to finally be sent home.

Another result of the formal ICE deportation process is the length of time one can be held after his sentence has been satisfied.  It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details.  On top of the time spent being transferred to ICE custody, the Office of Inspector General recently found that "only 29 percent" of inmates who received a final order of removal after entering ICE detention were removed within a month, and that, on average, they spent an additional *three months* in ICE detention at the conclusion of their sentence.  Off. of Inspector Gen., U.S. Dep't of Justice, No.

12

21-123, *Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates* 20-21 (2021), https://oig.justice.gov/sites/default/files/reports/21-123.pdf.  All the while an individual who should have been released from custody remains in a strange and dangerous place while paperwork is conveyed between the U.S. agencies involved and while the paperwork is processed by the home country in coordination with the U.S. authorities.[3]  All movement of an inmate following the completion of their sentence is severe – especially for an elderly infirm person.  Movement involves the use of handcuffs and leg irons throughout the transfer process.  Armed U.S. Marshals or ICE agents will accompany the detainee.  This includes the transfer from the BOP facility to a local detention center, movement to an ICE removal site, and the ride to the airport for the flight home.  An additional consequence of not being a U.S. citizen is that Mr. Lewis would be ineligible for the early release programs that are available to the BOP in addressing the circumstances of elderly and infirm inmates.

Judges in this District have recognized the impact of incarceration on non-citizens.  In *United States v. Connolly*, No. 1:16-cr-00370-CM (S.D.N.Y.), defendant Gavin Black, a U.K. citizen and former derivatives trader, was convicted of one count of conspiracy and one count of wire fraud following a jury trial.  Transcript at 2:16-3:1, *United States v. Connolly*, No. 1:16-cr-00370-CM (S.D.N.Y. Oct. 24, 2019), ECF No. 451 (hereinafter "*Black* Sent. Tr.").  Judge McMahon recognized that, because Black was not a U.S. citizen, he was not eligible to serve time at what she deemed to be an appropriate facility in the U.S. (i.e., a minimum security prison camp), and she could not guarantee that he would be placed in a comparable facility in the U.K.

---

[3]   The deficiencies and challenges in ICE medical care are well documented.  *See, e.g.*, Off. of Inspector Gen., U.S. Dep't of Homeland Sec., No. OIG-18-67, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf; Human Rights Watch et al., *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention* (2018), https://www.aclu.org/publications/code-red-fatal-consequences-dangerously-substandard-medical-care-immigration-detention.

She also expressed concern over the fact that, if he were sentenced to serve time in the U.S., he

would thereafter be subject to lengthy ICE detention.  At Black's sentencing, Judge McMahon

stated:

> If I could sentence Mr. Black to a term of incarceration – a brief term of
> incarceration – knowing that he would go to a facility appropriate to his criminal
> conduct, I would do it.  But I know that I can't.  I know that simply because he is
> a non[-]citizen – and I use that term advisedly.  He is not an illegal alien.  But
> because he is a non-citizen, he will not be eligible to serve his sentence in the
> same way that any American citizen who stood convicted of this crime would
> serve.  And that's not right.
>
> . . . [F]or reasons I cannot comprehend, at the end of that term he could not walk
> out the door and be picked up by [his attorney] and taken to the airport.  He would
> be treated like an illegal alien, and he would be released into the custody of ICE,
> and at some point long after my intended sentence had expired he would be
> deported.  And that's not right.
>
> . . . I can't bring myself to impose a sentence of incarceration in the United States
> for Mr. Black.

*Black* Sent. Tr. at 91:4-92:9.[4]

Similarly, in *United States v. Cohen*, No. 1:19-cr-00741-WHP (S.D.N.Y), in which the

defendant, a French citizen, pled guilty to conspiracy to commit securities fraud, the Court

acknowledged the consequences attached to his immigration status at sentencing and did not

impose a term of imprisonment.  Transcript at 37:3-6, *United States v. Cohen*, No. 1:19-cr-

00741-WHP (S.D.N.Y June 9, 2020), ECF No. 48 (hereinafter "*Cohen* Sent. Tr.").  Judge Pauley

concluded: "Foreign nationals, unlike similarly situated U.S. citizens, are unable to serve terms

of imprisonment in a camp or minimum security facility.  And when foreign nationals complete a

term of imprisonment they are transferred to ICE detention where they can wait for an indefinite

period to be returned to their home country."  *Cohen* Sent. Tr. at 42:7-15.

---

[4]    In 2022, the Second Circuit reversed Black's conviction and acquitted him on all counts, finding that the
government's evidence at Black's trial had been insufficient.  *See United States v. Connolly*, 24 F.4th 821, 823-
24 (2d Cir. 2022).

Finally, it is worth noting that Mr. Lewis could have positioned himself in the United Kingdom and fought extradition to the United States rather than face his Indictment voluntarily. Similar extradition proceedings in the U.K. have taken years, and the U.K. courts on many occasions have declined to extradite defendants to the United States for health reasons. Mr. Lewis did not take that route. He committed to come to the United States voluntarily to face the charges and did so within 48 hours of being notified of the Indictment. This posture reflects extraordinary acceptance of responsibility for his offense conduct, which occurred while Mr. Lewis was in his 80s.

**D.    Philanthropic Efforts and Significant Positive Impact**

As Judge Rakoff has observed, "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). Despite his humble roots and lack of formal higher education, Mr. Lewis has managed to compile a remarkable legacy of charitable works of enormous benefit to various communities.

First, Mr. Lewis has demonstrated a commitment to medical advancement in the treatment of cancer, which took the life of his first wife, and a commitment to medical service for underprivileged communities. In her letter to the Court, Dr. Alexandra Silverton, Mr. Lewis's granddaughter, wrote that her "grandfather directly influenced [her] desire to contribute to underserved populations," including her "intense residency at Bellevue Hospital in New York City and work as a hospitalist physician at University Medical Center in New Orleans and later Grady Memorial Hospital in Atlanta, Georgia, serving some of our country's most impoverished patient populations." (Ex. B at 1.) Dr. Silverton stated:

> My grandmother passed away at [an] early age from colon cancer. Since that time, my grandfather has dedicated significant time and resources to the advancement of medical research and healthcare delivery. This includes catalyzing donations to University of Central Florida College of Medicine and Orlando Health Cancer Institute as well as the development of a 650 acre health sciences campus referred to as Medical City in Orlando, Florida. My grandfather's personal war on cancer also inspired my husband to become a surgical oncologist and fight cancer on the front lines every day.

(*Id.*) Dr. Silverton added that she is "honored to support [her] grandfather in creating and running a scholarship program (Lewis Scholarship), providing full-ride scholarships to first-generation students in financial need." (*Id.*)

Mr. Lewis's passion in this field was also addressed in the letter to the Court from Dr. Deborah Campano German, the founding Dean of the University of Central Florida College of Medicine. Dr. German stated that "[i]n 2006 Mr. Lewis changed Central Florida and gave me and so many others the opportunity to thrive" when he "donated 50 acres of land and 12.5 million dollars so that UCF could build a medical school that would anchor a new medical city in Lake Nona." (Ex. L, Letter from Dr. Deborah Campano German, at 1.) The medical school "has graduated more than 1000 physicians" and supported "three new hospitals, including the busiest VA Hospital in the nation, the Nemours Children's Hospital that serves 85% children on Medicaid, the UCF Lake Nona Hospital that serves as an innovation hub and the UCF Cancer Center bringing hope through clinical trials to those who had no hope." (*Id.*) Dr. German concluded "that the good he has done in this world is beyond extraordinary." (Ex. L at 2.)

According to UCF's President, John Hitt, Mr. Lewis's efforts were instrumental in raising a total of $80 million for the medical school. Mr. Lewis then energized UCF's initiative to fund the scholarships for the entire inaugural class. When UCF offered to name the medical school after him for his record gift, Mr. Lewis declined so the university could use the naming rights in the future to raise additional money to aid its success. Today, the medical school's

naming rights value is estimated at $100 million.  Orlando's Mayor Buddy Dyer noted, "This wasn't just about building a medical school; it was about transforming the economy." *Central Floridian of the Year, 2006: Tavistock Owner Joe Lewis*, Orlando Sentinel (Jan. 14, 2007), https://www.orlandosentinel.com/2007/01/14/central-floridian-of-the-year-2006-tavistock-owner-joe-lewis/.  According to President Hitt, "You can't overstate the value of Joe's contribution . . . .  I don't believe we'd have a medical school if it weren't for Joe Lewis." *Id.* The *Orlando Sentinel*, central Florida's primary newspaper, recognized Mr. Lewis's state-wide efforts and named him the "Central Floridian of the Year." *Id.*

Second, Mr. Lewis has strived to create opportunities for the less fortunate through a variety of initiatives around the world in the communities he touches.  In Florida, Dr. T.J. Dorsey has written to the Court about Mr. Lewis's steadfast support for the Orlando Minority Youth Golf Association, which has benefited thousands of minority youth in central Florida.  Dr. Dorsey described how Mr. Lewis has dedicated land for the youth to train and practice in golf, and welcomes them to his golf courses, "providing unique opportunities for athletic development and social interactions."  (Ex. M, Letter from Dr. T.J. Dorsey, at 1.)  An annual awards banquet honors "the youth who have stayed the course of the year and achieved honors for their accomplishments."  (*Id.*)  Dr. Dorsey appended to his letter his recent correspondence from the United Negro College Fund expressing gratitude for the Golf Association's efforts, which "have not only taught thousands of young people the life-long sport of golf, but also the life skills of self-motivation, self-discipline, and self-confidence.  These skills have helped them become strong, compassionate, and responsible adults."  (Ex. N, Letter from Gwen T. Hewitt.)

In the U.K., Mr. Lewis directed his philanthropy through his involvement with the Tottenham Hotspurs football club.  Tottenham is an area deeply affected by poverty and

reminiscent of Mr. Lewis's upbringing.  He focused on enhancing health and well-being through education, equity, inclusion, and support for individuals with disabilities.  Mr. Lewis's work with the Tottenham Foundation led to several key developments, including Noah's Ark Children's Hospice facility, the Percy House for vocational training, a COVID Response Network, and many other programs, helping to positively impact more than 1,500 children weekly across many communities.  In conjunction with building a new state-of-the-art stadium for the community, Mr. Lewis constructed more than 250 units of affordable housing, a primary school, and other developments, creating more than 3,500 jobs and leading to £1 billion of gross economic recovery.  According to Sir Stuart Lipton, Regeneration Tsar for Tottenham, Mr. Lewis's new stadium efforts have been "the most effective mechanism for social change."[5]

In the Bahamas, Mr. Lewis sought to rejuvenate the economy by investing in underserved areas, building a new primary school (Windsor School), seeking first-generation scholars from underprivileged families, and providing full-ride university scholarships to UCF.  Bahamian students have received full tuition, room and board, textbooks, visas, and all travel expenses for years.  The Lewis Scholarship program has enabled recipients to become the first in their families to attend college and gain access to greater opportunities.

## SENTENCING CONSIDERATIONS

### E.    The Offense and the Sentencing Guidelines Range

On January 24, 2024, Mr. Lewis pled guilty before Your Honor to one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, and two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.  Pursuant to Mr. Lewis's plea agreement with the

---

[5]    *Tavistock® Group* at 59 (Nov. 18, 2012), https://issuu.com/tavistock/docs/tgroup_credential_overview_issuu.

Government, the parties agreed that the advisory Sentencing Guidelines range is 18 to 24 months' imprisonment, based on a Criminal History Category of I and an offense level of 15, and that either party may seek a sentence outside of the Guidelines range, based on the factors set forth in 18 U.S.C. § 3553(a). The parties further agree that Mr. Lewis may seek a downward departure from the Guidelines range because of his age under U.S.S.G. § 5H1.1, and/or Mr. Lewis's physical condition under U.S.S.G. § 5H1.4, and that the Government will not contest or otherwise oppose the application of either departure or any related adjustment to the Guidelines range.

**F.      Section 3553(a) Factors**

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary." *Id.* As the Court is aware, it must "undertake 'an individualized assessment'" to determine the appropriate sentence, "'based on the facts presented.'" *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). In making this determination, the Court may consider the applicable Sentencing Guidelines range but must not presume that this sentencing range is reasonable or proper in every case. The Court must "conduct its own independent review of the [§ 3553(a)] factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Specifically, the Court shall consider, among other factors:

1.      the nature and circumstances of the offense and the history and characteristics of the defendant;

2.      the need for the sentence imposed –

    (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)      to afford adequate deterrence to criminal conduct;

    (C)      to protect the public from further crimes of the defendant; and

19

> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

The Probation Department correctly concluded that a sentence of probation with a $5 million fine is sufficient, but not greater than necessary, in Mr. Lewis's case given a number of significant mitigating factors that the Court may properly consider under 18 U.S.C. § 3553(a).

**G.    Application of the Section 3553(a) Factors**

*1.    The Nature and Circumstances of the Offense*

Mr. Lewis acknowledges that his offenses were serious and that his behavior was unacceptable and deserving of punishment. In that spirit, he came voluntarily to the United States to face the charges, promptly resolved them through his guilty plea, and separately is in the process of resolving the parallel civil case brought by the Securities and Exchange Commission. As Mr. Lewis put it in his own letter to the Court: "I offer my apology with sincerity and humility, recognizing the gravity of my transgressions and the pain I have caused." (Ex. O, Letter from Joseph Lewis.)

Without minimizing the seriousness of Mr. Lewis's offense conduct, it is fair to note that the loss amount was relatively limited – less than $550,000 in total. Many insider trading cases in this District involve many millions of dollars. The monetary amount here translates to a relatively low Guidelines range of 18 to 24 months, given Mr. Lewis's lack of any criminal history. He will pay many times that sum – more than $51,600,000 in criminal and civil fines and forfeiture to the United States and to the SEC. The Presentence Report does not recommend restitution because the insider trading offenses are not of the type that inflict direct monetary loss on victims.

It is also worth noting that Mr. Lewis's offenses did not involve trading in any of the stocks at issue or for his own direct personal enrichment. This is not the case of a defendant who became rich through his offense conduct. To the contrary, Mr. Lewis's offense conduct took place in his 80s when he had ample legitimate wealth to confer legitimate benefits on people in his circle. As such, his offense conduct was senseless and deeply regrettable. As Mr. Lewis wrote: "Realizing my actions have violated the law and harmed those I love fills me with profound shame and embarrassment." (Ex. O.)

2.      *Mr. Lewis's Personal History and Characteristics*

We have recounted in detail above Mr. Lewis's personal circumstances. From modest beginnings in war-torn London, he rose to remarkable heights in the business world. Along the way, he has given back to communities around the world and made possible important advancements in medical care without trying to put his name on the institutions he has helped build.

Now, nearing the end of life, Mr. Lewis's age, ███████████████████ leave him frail and vulnerable, making a departure and/or variance from the stipulated Guidelines range amply justified. *See, e.g.*, *United States v. Barbato*, No. 00 CR. 1028(SWK), 2002 WL 31556376, at *4-5 (S.D.N.Y. Nov. 15, 2002) (finding downward departure under U.S.S.G. §§ 5H1.1 and 5H1.4 and no jail appropriate for 81-year-old defendant suffering from heart and back ailments); Transcript at 17:20-18:5, 19:21-20:14, *United States v. Ciaccio*, No. 1:19-cr-00833-SHS (S.D.N.Y. Nov. 18, 2021), ECF No. 419 (granting departure from Guidelines range of 78 to 97 months down to time served, since imprisonment of paralyzed defendant would "simply be shifting the costs of his medical care from Medicare or Medicaid to the Bureau of Prisons"); Transcript at 5:7-6:6, 34:24-36:1, *United States v. Voudouris*, No. 1:18-cr-00217-

KMW (S.D.N.Y. Mar. 2, 2020), ECF No. 292 (varying from a Guidelines range of 46 to 57

months, down to time served, in part because the defendant suffered from multiple sclerosis);

*United States v. Roth*, No. 94 CR. 726 (RWS), 1995 WL 35676, at *1-2 (S.D.N.Y. Jan. 30, 1995)

(granting departure to time served to 63-year-old defendant who suffered from ALS (Lou

Gehrig's disease)).  Probation estimated the average cost of imprisoning a defendant in a Bureau

of Prisons facility to be $49,770.  This cost to the U.S. government would be significantly higher

for Mr. Lewis given the numerous treatments and constant monitoring he requires.  A just

sentence in this case does not require such expenditures.

     3.     *Promoting Respect for the Law, Just Punishment, and Adequate Deterrence*

     Mr. Lewis has come to the United States voluntarily to accept responsibility for his

offenses and face the consequent punishment.  Through his own fault and because of his

notoriety, he has been humiliated in the worldwide media, which has covered this case

extensively because of Mr. Lewis's connection to the Tottenham Hotspurs football team.  He has

agreed to be subject to an SEC injunction, to adhere to the strict special conditions of Broad

Bay's probation, and to pay significant monetary penalties many times greater than the losses at

issue in his case.  He will be banned from reentering the United States, where his children,

grandchildren, and great-grandchildren reside.  No observer could reasonably conclude that a

sentence of probation for Mr. Lewis would be unjust.

     The sentence of probation recommended in the Presentence Report would be consistent

with general and specific deterrence.  As a first time offender who is 87 years old, Mr. Lewis's

likelihood of recidivating is non-existent, especially in light of his damaged reputation, the SEC

injunction, and the special conditions in the Broad Bay plea agreement restricting his access to

material, non-public information at public companies.[6] *See* Aging Report, *supra*, at 39-40 & tbl. 7 (observing a zero percent re-arrest rate within three years of release for a random sample of aging BOP inmates age 70 and older).  Pursuant to the terms of Broad Bay's plea agreement, Mr. Lewis is barred from holding a board of director seat, or participating in any board of director meetings of any corporation publicly traded in the United States, and must divest and cease any ownership interest in or control of Boxer Capital, stripping away the main source of information that laid the foundation for this offense.

Courts in this District have also viewed a sentence of probation in insider trading cases as sufficient to satisfy the need to promote general deterrence as well.  Judges in this District have determined that insider trading defendants, in appropriate circumstances, do not need to be sentenced to prison where the loss of reputation, professional opportunities, and financial opportunities is sufficient to demonstrate to others that insider trading is a crime that is not worth committing.  *See, e.g.*, *Cohen* Sent. Tr., *supra*, at 41:7-44-22; Transcript at 18:13-21-8, *United States v. Wong*, No. 1:22-cr-00395-ER (S.D.N.Y. Apr. 12, 2023), ECF No. 83; Transcript at 14:9-16:22, *United States v. Tsai*, No. 1:19-cr-00675-VM (S.D.N.Y. Jan. 17, 2020), ECF No. 32; Judgment in a Criminal Case at 1-2, *United States v. Collins*, No. 1:18-cr-00567-VSB (S.D.N.Y.  Feb. 5, 2020), ECF No. 173; Judgment in a Criminal Case at 1-2, *United States v. Zarsky*, No. 1:18-cr-00567-VSB (S.D.N.Y.  Feb. 5, 2020), ECF No. 174; Transcript at 16:2-17:3, *United States v. Oujaddou*, No. 1:18-cr-00579-JSR (S.D.N.Y. Oct. 11, 2019), ECF No. 167.

While many of these cases have also involved a period of home confinement, the Probation Department appropriately recommended otherwise for Mr. Lewis.  The Presentence

---

[6]    Mr. Lewis has made an offer of settlement in the parallel SEC case that we expect to be approved by the Commission prior to sentencing.  He has agreed to an injunction against future violations of the securities laws and the payment of a penalty of approximately $1.6 million, which is three times the losses at issue in this case.

Report stated: "We do not recommend home confinement in this case based in part on the likelihood of the defendant being deported following his conviction." (PSR at 34.) As noted, if sentenced to probation, Mr. Lewis will promptly self-deport by departing from the U.S. voluntarily through his own travel arrangements. Given his frailty and health needs, Mr. Lewis cannot risk a deportation process through an ICE detention facility. Given his bail restrictions and his restrictive health challenges, Mr. Lewis has essentially been on home confinement in Florida during the past nine months since coming to the United States to face the Indictment.[7]

---

[7] If, contrary to the recommendation of the Probation Department, the Court were to deem it necessary to sentence Mr. Lewis to a term of home confinement, we respectfully request that the Court allow him to serve it in the Bahamas where he is a resident. Judge McMahon allowed a defendant who, like Mr. Lewis, was a U.K. citizen to serve a term of nine months of home confinement in the U.K. as a condition of his supervised release. *See Black* Sent. Tr., *supra*, at 95:6-15. Similarly, Judge Virginia Kendall of the Northern District of Illinois sentenced a U.K. citizen and former trader who pled guilty to wire fraud and spoofing to time served and, as a condition of supervised release, a term of home confinement to be served in the U.K. *See* Transcript at 38:1-41:25, *United States v. Sarao*, No. 1:15-cr-00075 (N.D. Ill. Jan. 28, 2020), ECF No. 121.

**CONCLUSION**

For all the foregoing reasons, we respectfully request that the Court sentence Mr. Lewis

to a term of three years' probation and a $5 million fine, as recommended in the Presentence

Report.

Dated: March 21, 2024

<div style="margin-left: 40%;">

Respectfully submitted:

By: /s/ David M. Zornow
David M. Zornow
Christopher J. Gunther

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000
Fax: (212) 735-2000
david.zornow@skadden.com
christopher.gunther@skadden.com

*Attorneys for Joseph Lewis*

</div>