UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA
                                          :
            - v. -                              23 Cr. 370 (JGLC)
                                          :
JOSEPH LEWIS,
                                          :
            Defendant.
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Nicolas Roos
Jason A. Richman
Assistant United States Attorneys
- Of Counsel -

The Government respectfully submits this sentencing memorandum in advance of the April 4, 2024 sentencing of defendant Joseph Lewis.

## PRELIMINARY STATEMENT

Joseph Lewis committed grave, serial breaches of the duties he owed publicly traded companies to keep information confidential. As a billionaire investor, Lewis had privileged access to non-public, market-moving information by virtue of his large investments in certain companies. But while he was obligated to keep that information secret, and not trade on it, he did the opposite. On at least four separate occasions, he tipped his girlfriend, personal pilots, employees, and friends with closely guarded, valuable information entrusted to him, intending that those individuals would trade securities he recommended. With the benefit of Lewis's recommendations, those individuals profited. This insider trading was not the result of aberrant, one-time conduct, but rather, a troubling pattern of misconduct over the course of several years. In the process, Lewis's conduct undermined the integrity of the securities markets from which he has so handsomely profited for decades. And, as he now acknowledges, "his offenses were serious" and his "behavior was unacceptable and deserving of punishment." (Dkt. 60 at 20).

Unlike many defendants who commit insider trading, Lewis's conduct was not motivated by personal profit—he did not personally trade based on inside information, and did not make any money. Lewis describes his insider trading in his letter to the Court as motivated by "hubris and childish exuberance." Whether his criminal conduct was motivated by hubris, ego, a desire to make a financial gift without parting with his own money, an irrational form of greed, or some other reason, it is clear that Lewis believed he was above the law—that he had achieved a level of wealth and stature that relieved him from having to operate by the same rules that apply to everyday investors. For these, and the reasons discussed further below, the United States Sentencing

Guidelines appropriately advise that a sentence of imprisonment between 18 and 24 months is justified by the conduct in this case.

Consistent with that guidance, standing alone, Lewis's conduct would merit a significant sentence, one within the applicable Sentencing Guidelines range. But as described at length in Lewis's sentencing submission, and as recognized by the Probation Department, Lewis is elderly and battles significant health issues, many of which would make a term of imprisonment more difficult than it would be for a differently situated defendant. Those health conditions, coupled with the facts that Lewis demonstrated acceptance of responsibility by traveling to the United States to voluntarily surrender (instead of engaging in a protracted extradition battle), promptly accepted responsibility through a guilty plea, and has otherwise lived a law-abiding life, weigh in favor of leniency. Accordingly, the Government agrees with the defendant and the Probation Office that a downward variance, in some form, is appropriate.

On balance, and in consideration of both the seriousness of the offense and the unique mitigating age and health factors at issue for Lewis, the Government respectfully submits that, although punishment is warranted by Lewis's conduct, a sentence of 18 to 24 months' imprisonment would be greater than necessary to serve the goals of sentencing in this case.

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

**A. Background and Offense Conduct Overview**

Joseph Lewis is the founder and owner of Tavistock Group ("Tavistock"), a private investment organization whose investments in currencies and hundreds of companies have earned the defendant billions of dollars. (March 13, 2024 Final Presentence Investigation Report ("PSR") ¶¶ 112-13). Tavistock's investment portfolio includes the professional soccer team the Tottenham Hotspurs; master-planned communities and resort properties in Florida, The Bahamas, and

Jamaica; hotel properties; restaurant groups; and ownership interests in private investment funds. (PSR ¶ 13). As a result of his business success, particularly successful currency trading, Lewis is one of the 500 richest people in the world, worth approximately $6.2 billion as of February 2024. (PSR ¶ 120). He has used his tremendous wealth to purchase, among other things, homes in several countries, a $250 million yacht, a private aircraft valued at $90 million, an art collection worth $100 million. (PSR ¶ 118).

Lewis owns approximately 80 percent of an investment fund called Boxer Capital, which makes investments in publicly traded life science companies. (PSR ¶ 117). As the majority owner of Boxer Capital, Lewis insisted on receiving updates on the investments made by Boxer Capital, including about investment opportunities and the results of clinical trials by certain companies in which he had invested. (PSR ¶ 18). Lewis learned through Boxer Capital material, non-public information about the companies in which Boxer Capital invested. (PSR ¶ 19). Lewis knew that such information was confidential and that he and Boxer Capital were restricted from sharing the information with third parties or trading based on that information. (*Id.*). Indeed, as the chairman of Tavistock, and the majority owner of the Boxer Capital, Lewis owed duties of trust and confidence to the principals and minority owners of Boxer Capital, and by extension to the companies from which Boxer Capital received confidential information, to keep the information confidential. (PSR ¶ 18).

Nonetheless, and despite this knowledge, Lewis shared material, non-public information about multiple companies over the course of several years as gifts or often in lieu of other compensation, allowing his employees, friends, and romantic interests to cheat the market and trade for profit on this information. Indeed, as further detailed below, on at least four separate occasions, Lewis engaged in insider trading by tipping or causing others to trade. Such insider

trading involved the stock of the following publicly traded companies: Australian Agricultural Company (PSR ¶¶ 21-27); Solid Biosciences (PSR ¶¶ 28-34); Mirati Therapeutics (PSR ¶¶ 35-43); and BCTG Acquisition Corporation (PSR ¶¶ 53-57). Lewis did not personally profit from the insider trading, and the total gains to his employees, friends, and romantic interests would have been trivial to him. But to the tippees, the profits were significant: $548,601.84. (PSR ¶ 58).

### 1. Australian Agricultural Company

The Australian Agricultural Company ("AAC") is a publicly listed Australian company that owned and operated cattle feedlots and farms in Australia. (PSR ¶ 21). At all times relevant to the charges in this case, Lewis owned a majority of AAC's stock, and two employees of Tavistock served on AAC's board of directors. (*Id.*). In early 2019, a monsoon caused significant flooding in Queensland, Australia, which impacted AAC. (PSR ¶ 22). Initially, the impact on the company was unknown, because AAC owned millions of acres of land, and because the potential for insurance coverage or Government assistance was not clear. (*Id.*). On February 10, 2019, AAC's board of directors held a meeting and determined that losses were likely to be material, that there was not sufficient insurance coverage, and that the Australian government was not expected to cover the losses, and, that same day, a board member employed by Tavistock told Lewis the same. (PSR ¶¶ 23-24).

Lewis then provided this material, non-public information to his personal pilots, who had previously invested in AAC, and therefore stood to lose money based on this negative news. (PSR ¶ 25). More specifically, after the meeting but before any public announcement, on February 10, 2019, Lewis called one of his pilots, Patrick O'Connor, and they discussed that O'Connor and Lewis's other pilot (Bryan Waugh) should sell all of their AAC stock. (*Id.*). After Lewis tipped off O'Connor, both pilots contacted their stockbroker to order the immediate sale of their AAC stock.

As a result of this flooding, on February 11, 2019, AAC issued an announcement regarding the anticipated losses and, that day, AAC's share price closed down 12.3 percent from the prior day. (PSR ¶ 26). Despite the pilots' efforts to quickly trade on Lewis's inside information, the stockbroker working for the pilots was unable to execute their requested sale orders before AAC's public announcement. (PSR ¶ 27).

## 2. Solid Biosciences

The second publicly traded company whose material, non-public information was provided by Lewis to his co-conspirators is Solid Biosciences ("SLDB"). SLDB is a publicly traded biotechnology company focused on developing treatments for Duchenne muscular dystrophy, a generic disease, and is listed on the Nasdaq stock exchange. (PSR ¶ 28). In 2018, Lewis became a significant shareholder of SLDB through Boxer Capital and his own stock holdings. (*Id.*).

In July 2019, when Lewis was one of SLDB's three largest shareholders, SLDB sought approximately $60 million in capital through a private investment in public equity ("PIPE") transaction. (PSR ¶ 29). On July 18, 2019, an investment bank working on SLDB's behalf contacted Boxer Capital about a potential investment in the PIPE transaction, and Boxer Capital signed a confidentiality agreement. (*Id.*). After the confidentiality agreement was signed and in connection with the contemplated PIPE investment, SLDB provided Boxer Capital with non-public information about a clinical trial, and, in particular, information that SLDB intended to disclose to the market approximately one month later. (*Id.*). Lewis learned about the planned PIPE transaction, about the planned clinical trial, and about information relating to progress on the PIPE transaction on multiple occasions. (*Id.*). All the while, Lewis knew that the information he received was confidential and non-public. (*Id.*).

On July 25, 2019, while visiting South Korea with his girlfriend, Lewis tipped her and told her to purchase SLDB stock before news of the PIPE transaction or the clinical trial was public. (PSR ¶ 31). Shortly after speaking to him, Lewis's girlfriend used nearly all of her available funds to purchase $700,000 worth of SLDB stock. (*Id.*). The next day, Lewis and his girlfriend flew on Lewis's private airplane, which was piloted by O'Connor and Waugh. (PSR ¶ 32). During the flight, Lewis told the pilots that he had purchased a large share of SLDB and that they should buy the stock as soon as possible. (*Id.*). While in flight, SLDB announced the PIPE transaction. (PSR ¶ 33). Waugh and O'Connor were not able to capitalize on this information because they were in flight. (PSR ¶¶ 33, 34). Nonetheless, SLDB had not yet released its clinical trial results and, shortly after landing in the United States, both O'Connor and Waugh purchased SLDB stock. (PSR ¶ 33). On August 14, SLDB released confidential information about its clinical trial and the company's share price increased by approximately 23 percent. (PSR ¶ 34). Lewis's girlfriend and pilots all sold their SLDB stock for a profit over the ensuing weeks. (*Id.*).

### 3. Mirati Therapeutics

The third company whose stock was at issue in this scheme is Mirati Therapeutics ("Mirati" or "MRTX"), a Nasdaq-listed oncology company focused on the development of cancer therapeutics. Lewis was one of Mirati's largest shareholders by virtue, again, of his direct ownership and beneficial ownership through Boxer Capital. (PSR ¶ 35). Lewis had control over a Mirati board seat, which was occupied by an employee of Boxer Capital, who routinely received material, non-public information about MRTX. (*Id.*). Among other things, this included information about clinical trials, the timing of corporate announcements, and planned presentations of data at conferences, which was then often shared with Lewis. (*Id.*). Lewis understood that this was material, non-public, confidential information, and due to the relationship between Lewis,

Boxer Capital, Tavistock, and Mirati, Lewis was highly restricted in when he could purchase MRTX stock and what he could do with the information he was given. (*Id.*). Indeed, Boxer Capital had an explicit agreement with Lewis and his employees that they would pre-clear any trades in MRTX to confirm that Boxer Capital and Lewis were not in possession of any material non-public information at the time. (*Id.*). Boxer Capital would have never shared confidential information with Lewis if it had any reason to believe that Lewis was using the information inappropriately, disseminating it to others, or tipping friends and employees so that they could insider trade. Despite Boxer Capital's and Tavistock's carefully calibrated policy to avoid insider trading, Lewis used and misappropriated the information he was given on multiple occasions.

In 2019, Mirati was conducting a clinical trial for a drug that had the potential to inhibit mutations of the KRAS gene, which underlies approximately 20 percent of human cancers. (PSR ¶ 36). In August 2019, Boxer Capital learned through a confidential update from Mirati that the company was planning to release the first clinical data from its trial in the fourth quarter of 2019, and Lewis was provided that information by Boxer Capital. (*Id.*). Over the next two months, Boxer Capital updated Lewis about the results, and discussed the potential positive effect they could have on Mirati's share price. (PSR ¶ 37). Within days of learning the information, Lewis called his girlfriend and told her to sell her SLDB shares in order to purchase MRTX stock instead, giving her detailed instructions about how to go about selling and buying the stock. (PSR ¶ 38). Following Lewis's directions, his girlfriend spent almost all of the funds in her brokerage account on MRTX. (*Id.*).

On October 10, 2019, O'Connor and Waugh flew Lewis to the Bahamas, and Lewis told them to purchase as much MRTX stock as they could and, in the process, to sell their SLDB stock in favor of Mirati. (*Id.*). The next day, both pilots purchased MRTX stock. (*Id.*). Lewis gave his

pilots specific information on the timing of the announcement, telling them (in O'Connor's words) that they could "take profit" in approximately "6 to 8 weeks." (*Id.*). Lewis's conduct was not limited to providing the tips to his pilots. He also loaned each of them $500,000 to purchase more MRTX stock so that they could take advantage of the unlawfully misappropriated information. (*Id.*).

Lewis also told several other individuals to purchase Mirati stock before the public announcement of the clinical trials, including one of his several personal assistants, and at least three other friends, including one with whom he was romantically involved and another with whom he played poker in Argentina. (PSR ¶ 41).

On October 28, 2019, Mirati announced favorable results, just as Lewis had promised his web of insider traders. (PSR ¶ 42). The following day, Mirati's share price closed up approximately 16.7 percent from the previous day's close. (*Id.*). The individuals who Lewis tipped later sold their shares of Mirati. To close the loop on his assistance to his pilots and co-defendants, on November 11, 2019, Lewis asked them to repay the $500,000 loans he had given, which they both promptly did. (PSR ¶ 42).

### 4. BCTG Acquisition Corporation

Finally, in July 2020, in consultation with Lewis, Boxer Capital created a special purpose acquisition company called BCTG Acquisition Corporation. (PSR ¶ 53). In January 2021, BCTG began negotiating a potential business combination with Tango Therapeutics ("Tango"), to take the company public. (*Id.*). On January 27, BCTG sent Tango a nonbinding letter of intent, the parties began diligence, and members of BCTG's board of directors began updating Lewis about the progress. (*Id.*). This information was confidential and subject to a non-disclosure agreement. (*Id.*). Lewis saw both O'Connor and Waugh on February 4, 2021, and told them to purchase BCTG

stock, which they both did that day. (PSR ¶ 54). O'Connor told his broker to buy "all the BCTG" that he was able to purchase. (*Id.*). The following month, Lewis told two of his personal assistants who were working on his yacht to purchase BCTG's stock, which they, too, did. (PSR ¶ 56). Again, this non-public information proved a winner, as, on April 14, 2021, BCTG publicly announced its planned merger with Tango and its stock price increased by 14.5 percent. (PSR ¶ 57).

## B.  Procedural History

Indictment S1 23 Cr. 370 (JGLC) (the "Indictment") was filed on July 24, 2023, and charged Lewis with two counts of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Counts 1 and 2); fourteen counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5, 240.10b5-1, and 240.10b5-2, and 18 U.S.C. § 2 (Counts 3 through 15); three additional counts of securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (Counts 16, 17, and 18); and one additional count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count 19). After being notified of the existence of a warrant for his arrest, Lewis flew back to the United States and self-surrendered the day that the Indictment was unsealed. He was released that same day after posting a $300-million-dollar personal recognizance bond secured by significant property. (PSR at p. 2). On January 24, 2024, Lewis pled guilty, pursuant to a plea agreement with the Government (the "Plea Agreement"), to Counts One, Seven, and Ten of the Indictment. (PSR ¶¶ 10, 11).

## C.  Presentence Investigation Report

Using the November 1, 2023 Guidelines Manual, the Probation Office, consistent with the Plea Agreement, concluded that Lewis's offenses result in a total Guidelines offense level of 15, calculated as follows:

1. The guideline applicable to the offenses charged in Counts One, Seven, and Ten (which are treated as a single group pursuant to U.S.S.G. § 3D1.2(b) & (d)) is U.S.S.G. § 2B1.4.

2. Pursuant to U.S.S.G. § 2B1.4, the base offense level for the offenses is eight.

3. Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(I), because the gain resulting from the underlying offenses was approximately $548,601.84, 12 levels are added.

4. The adjusted offense level is therefore 20.

5. Pursuant to U.S.S.G § 4C1.1(a), two levels are deducted, because, based upon the information now available to this Office (including representations by the defense), the defendant qualifies for an adjustment for certain zero-point offenders.

6. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

7. The total offense level is 15.

(PSR ¶¶ 68-78). The defendant has no criminal history points and is in Criminal History Category I. (*Id.* ¶ 82). Accordingly, the defendant's applicable sentencing Guidelines range pursuant to the November 1, 2023 Guidelines Manual is 18 to 24 months' imprisonment. (PSR at p. 33). The parties agreed in the Plea Agreement that Lewis is not prohibited from seeking a downward departure under U.S.S.G. § 5H1.1 because of his age and U.S.S.G. § 5H1.4 because of his physical condition. (PSR ¶ 11(c)(iii)).

The Probation Office, citing the two bases for a downward departure, recommends a sentence of 3 years' probation. (PSR at p. 33). In making its recommendation, the Probation Office noted among other things that the defendant has "significant health issues" such that his doctors have concluded that "incarceration would be risky and possibly lethal for the defendant." (PSR at p. 34). The Probation Office also emphasized that the defendant has no criminal history, and that if he were placed in BOP custody, he would be transferred into ICE custody following any sentence. (*Id.*)

## APPLICABLE LAW

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted

above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## DISCUSSION

Starting with the applicable Sentencing Guidelines range, and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of his offenses, the need to avoid unwarranted sentencing disparities, and the importance of deterrence, the Government believes that a lengthy prison sentence is not necessary to satisfy the purposes of sentencing in this case but that some form of punishment is warranted.

A. **Punishment Is Necessary Because of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment for the Offense.**

The nature and seriousness of the offense and the need to provide just punishment and promote respect for the law warrant some form of punishment in this case. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Lewis exploited inside information for the benefit of his friends and employees. He breached duties of trust and confidence he owed to public companies, and to an investment firm that he partially owned. The harms caused by Lewis are significant. First, Lewis harmed the source of the confidential information, victimizing publicly traded companies and Boxer Capital. Lewis's misappropriation of confidential information from those sources unfairly risked damage to their reputations, and exposed them to costs. As Judge Rakoff has described the harm, "[t]his was the functional equivalent of stabbing [the victim company] in the back." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

Second, the defendant's conduct eroded confidence in the fairness of the stock market. Insider trading "creates [the] perception in the public including, among investors and would be investors, that the market is somehow rigged or, at the very least, that certain individuals who have more access to information have the upper hand in terms of making investment decisions both whether to buy or to sell." *United States v. Collins*, No. 18 Cr. 567 (VSB) (Jan. 17, 2020), Sent. Tr. at 87-88. Such a sentiment is particularly true in a case like this one, where the tipper is a publicly known billionaire with access to information about hundreds of companies, thus multiplying the threat to society that attaches to his conduct.

Third, insider trading "appropriate[s] some part of the returns … at the expense of other shareholders" and "tends to discourage corporate investment and reduce the economic efficiency of corporate behavior." Michael Manove, *The Harm From Insider Trading and Informed Speculation*, The Quarterly Journal of Economics (Nov. 1989). Because of the economic harm caused by insider trading, and because "[o]ur markets are … such an important part of the fabric of our economic life," it is important to "punish those who would hurt the integrity of that system." *United States v. Wong*, No. 22 Cr. 395 (ER) (Jan. 26, 2024), Sent. Tr. at 24.

The harm, in each of the foregoing respects, is amplified by the scale of Lewis's insider trading. The defendant engaged in multiple instances of insider trading, over multiple years, on multiple continents, with multiple people. He tipped several individuals, including his employees, friends, and romantic interests. He was the single source of the misappropriated inside information, and he was the sole tipper at the heart of this vast network. Put another way, without Lewis, no one else would have traded on insider information. That is, after all, why Lewis is responsible for the insider trading gains of others. The fact that Lewis was the originating source of the misappropriated information—and provided it to so many people—is an aggravating factor the

Court should incorporate into its sentence. This pattern of behavior, as much as anything, reflects how serious this breach of confident is, and also speaks, as discussed below, to the need to deter the defendant and others from this type of conduct.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. Punishment may come in many forms. In addition to any restrictions on his liberty that the Court may impose, the defendant will be subject to hefty financial penalties and significant restrictions on his future business activities, including his agreement to have all entities under his ownership or control resign and otherwise relinquish their control over board of director seats and participation in board of director meetings of any corporation publicly traded in the United States during a five-year term of probation for Broad Bay Ltd.

**B.  Punishment Is Necessary for General and Specific Deterrence.**

Punishment is also necessary in this case to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). As to specific deterrence, it seems obvious that, given his age, the restrictions on his involvement in publicly traded companies, and having suffered such a blow to his reputation, Lewis is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result. General deterrence, however, remains a significant concern. "[I]nsider trading is an easy crime to commit but a difficult crime to catch," *Gupta*, 904 F. Supp. 2d at 355, and in order to ensure others similarly situated to the defendant do not come to think that it is "a game worth playing," *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving general deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8,

2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading).

For those reasons, it is important here to impose a punishment that will deter future insider trading. Deterrence is important in this case. Regardless of the motive or circumstances, this type of conduct cannot be tolerated. Only a fair punishment would adequately ensure that those who would be tempted by a similar path understand the true consequences of such conduct.

## C.     Punishment Must Reflect the History and Characteristics of the Defendant.

Of course, the Court must also consider the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The defendant's sentencing submission outlines several mitigating factors that the Court should consider at sentencing. The defendant is 87 years old and has significant medical issues. Lewis seeks a downward departure based on his age and health. The Government has not independently evaluated Lewis, and therefore takes no position on whether the defendant is "infirm," U.S.S.G. § 5H1.1, or has an "extraordinary physical impairment" that renders him "seriously infirm," U.S.S.G. § 5H1.4, making a downward departure appropriate. That said, in recognition of the defendant's age and medical issues, the Government believes that a variance from the applicable Guidelines range is required to achieve a sentence that is sufficient but not greater than necessary.

In addition, there are several other mitigating factors that the Court should consider in sentencing Lewis. Those include, as outlined in the defendant's sentencing submission, that he is

a first-time offender; he voluntarily surrendered in the United States rather than going through extradition; and he has suffered reputational damage as a result of the public scrutiny of this matter.

D.    **The Kinds of Sentences Available.**

In light of the seriousness of the offense, the need for deterrence, and the nature and circumstances of the defendant, the Court should consider the range of possible sentences as set forth in Chapter 5 of the Sentencing Guidelines. *See* 18 U.S.C. § 3553(a)(3). The applicable Guidelines, as set forth in the defendant's plea agreement, are 18 to 24 months' imprisonment, which is within Zone D of the Sentencing Table. Were the Court to conclude that a downward departure or variance was appropriate, the Court could consider imposing a sentence within Zones A, B, or C. A Guidelines sentence within Zone A may be imposed without a sentence of imprisonment. A Guidelines sentence in Zone B or C of the Sentencing Table permits the Court to (i) impose a sentence of imprisonment, *see* U.S.S.G. §§ 5C1.1(a), (c)(1), and (d)(1), (ii) impose a sentence of imprisonment that includes a term of supervised release with a condition that half the term of imprisonment be served as home detention, *see* U.S.S.G. § 5C1.1(c)(2) and (d)(2), or (iii) impose a sentence of probation that includes home detention, *see* U.S.S.G. § 5C1.1(c)(3).

In his sentencing submission, the defendant contends that as a citizen of the United Kingdom, and as a resident of the Bahamas, he is ineligible for designation to a minimum security prison camp. At this time, the Government understands that the Bureau of Prisons does not strictly forbid the designation of a non-citizen to a minimum security prison camp, and the Court may make such a recommendation. That said, the Bureau of Prisons does not ordinarily designate non-citizens to such facilities, and any designation decision, were the defendant to be sentenced to a term of incarceration, would be left to the discretion of the Bureau of Prisons.

### E.    The Sentence Should Avoid Unwarranted Sentencing Disparities.

The Court must consider the need to avoid unwarranted sentencing disparities. Courts in this district have generally sentenced individuals convicted of insider trading to terms of incarceration. *See, e.g., United States v. Stone*, No. 22 Cr. 510 (MKV) (defendant sentenced to 28 months' imprisonment following guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea); *United States v. Dikshit*, No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment following early guilty plea); *United States v. Polevikov*, No. 21 Cr. 774 (LJL) (defendant sentenced to 33 months' imprisonment following pre-indictment guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment following guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (defendant sentenced to 26 months' imprisonment following guilty plea).

To be sure, Lewis presents differently from many defendants, for the reasons discussed at length here and in his submission. But his offense conduct does not—if anything, his behavior was more egregious than some other traditional insider trading defendants, given how many securities, co-conspirators, and trades were involved in his conduct. Indeed, there are parallels between Lewis's conduct and two other non-trading tipping defendants that were previously sentenced in this district. First, James McDermott, the former chairman and CEO of a Wall Street investment banking firm, was sentenced to 8 months' imprisonment for tipping his mistress, who along with a friend together made $174,000 in insider trading profits. *United States v. McDermott*, No. 00 Cr. 61 (KMW) (Aug. 3, 2000). Second, and more recently, Sean Stewart, a vice president at a healthcare investment bank, was sentenced to 24 months' imprisonment for tipping his father, who along with a friend made $1.1 million in insider trading profits. *United States v. Stewart*, No. 15 Cr. 287 (JSR) (Dec. 15, 2019). In both cases, motivated by personal affection, the defendants

betrayed their duties to a company and tipped others, causing them to trade. In neither case did the defendant personally make money. But in both cases, a significant sentence was still appropriate to reflect the seriousness of the offense and afford adequate deterrence. While certainly every case is unique, and there are some mitigating factors in Lewis's case that did not exist for McDermott or Stewart, the cases bear consideration in order to avoid disparate outcomes across different cases.

### F.    Financial Penalties and Corporate Resolution

As the parties have agreed, significant financial penalties are appropriate in this case.

Starting with a fine, Lewis plainly has the ability to pay. The Guideline fine is $7,500 to $5 million, and the Probation Department recommends a $5 million fine. (PSR p. 33).[1] Such a fine is appropriate here.

Second, because Lewis did not personally gain from the insider trading, no forfeiture is appropriate.

Third, because the victim of insider trading is the owner of the information that was misappropriated, restitution may be appropriate in the form of attorney fees or other costs incurred by the victim by participating in the investigation of the defendant or his co-conspirators. *See United States v. Gupta*, 925 F. Supp. 2d 581 (S.D.N.Y. 2013). The PSR has indicated that the victims of the insider trading are Solid Biosciences, Mirati Therapeutics, BCTG/Tango Therapeutics, and Australian Agricultural Company. (PSR ¶ 63). Additionally, as the PSR correctly notes, because Lewis learned the information on at least two occasions through an insider

---

[1] As part of a separate agreement, Broad Bay Ltd., a company owned by Lewis, pled guilty to securities fraud relating to a long-running scheme to misrepresent Lewis's and his entities' ownership in Mirati. (PSR ¶¶ 44-52). Through this scheme, Lewis was able to exercise Mirati warrants that he and his companies would not otherwise have been entitled to exercise. (*Id.*). The Broad Bay plea agreement includes stipulated total financial penalties. The Government notes that to the extent the Court imposes a fine as part of the sentencing of Lewis, under the Broad Bay plea agreement that amount would be deducted from the total financial penalty imposed on Broad Bay.

at Boxer Capital, who was totally unaware of and uninvolved in Lewis's misconduct, Boxer Capital also would qualify as a victim. (*Id.*) The Government has received one request for restitution from Solid Biosciences, attached as Exhibit A, in which it requests $436,015 in attorney's fees. (*See* Ex. A). Under 18 U.S.C. § 3664(d)(5), for a period of 90 days after sentencing, the Court may make a final determination of victim losses and, if appropriate, issue an amended judgement with an order of forfeiture. This so-called "time-related directive" may be further extended, as necessary, by the Court. *See Dolan v. United States*, 560 U.S. 605, 610-11 (2010); *see also United States v. Avenatti*, 81 F.4th 171, 203-07 (2d Cir. 2023). Because the trial of one of Lewis's co-defendants may result in additional expense to victims, which could prompt a request for restitution, the Government respectfully requests that the Court set a control date of 90 days from sentencing, at which time the Government will provide the Court with an update on restitution requests and, if needed, seek a further extension of time.

Finally, as the Court knows, Broad Bay Ltd. previously pled guilty and agreed, pursuant to Rule 11(c)(1)(C), to certain financial and injunctive penalties. As the Court has accepted that plea, the Government respectfully requests that the Court impose the sentence as set forth in the Broad Bay plea agreement.[2] Furthermore, as Lewis has agreed to comply with certain conditions in the Broad Bay plea agreement, the Government respectfully requests that the Court impose compliance with those conditions as special conditions of Lewis's supervised release or probation.

---

[2] At the sentencing of Broad Bay, or at a point thereafter, it may become necessary to modify certain injunctive relief as, for instance, certain companies become publicly traded. In the event such a situation manifests, the Government will promptly write to the Court.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that although punishment is warranted by the conduct in this case, a sentence below the applicable Guidelines range of 18 to 24 months' imprisonment would be sufficient but not greater than necessary in this case.

Dated: New York, New York
     April 1, 2024          Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

                By: _____/s_____
                            Nicolas Roos
                            Jason A. Richman
                            Assistant United States Attorneys